F.G. YABSLEY, Eleanor Yabsley, John W. Davis, Juanita J. Davis, William G. Davis, Chris C. Svendsen, Marjorie S. Bourne, Betty Rose Johnson, Ruth Marie Peyton, Plaintiffs,

v.

C.T. CONOVER, United States Comptroller of Currency; James E. Brennan, Manager, and Fred D. Finke, Acting Manager, Bank Structure Analysis Bank Organization & Structure, Office of the Comptroller of the Currency; NBE Bancshares, Inc.; National Bank of Earlville; James R. Bann; T.M. Anderson, Sr.; Kenneth Davis; Robert J. Gast; James E. Malley; George W. Norton; Robert Rave; R.W. Strong, & Lester Weidner, Defendants.

No. 83 C 5606.

United States District Court, N.D. Illinois, E.D.

Sept. 10, 1986.

Lawrence A. Kerns & Assoc., Richard T. Cozzola, Chicago, Ill., for plaintiffs.

Dan K. Webb, U.S. Atty., Gail Ginsberg, Asst. U.S. Atty., Chicago, Ill., Ronald R. Glancz, Frank C. Bonaventure, Washington, D.C., for Conover, Brennan, & Finke.

Paul E. Freehling, Pope, Ballard, Shepard & Fowle, Ltd., Chicago, Ill., for NBE Bancshares, Nat. Bank of Earville; Bann, Anderson, Davis, Gast, Malley, Norton, Rave, Strong & Weidner.

## MEMORANDUM OPINION

KOCORAS, District Judge.

The plaintiffs in this action are nine former shareholders of the National Bank of Earlville, (the bank), a publicly-held national bank in Earlville, Illinois. As of July 30, 1982, the plaintiffs owned 818 of the 4000 outstanding shares of bank stock. On or about that date, the bank issued a proxy statement announcing a special shareholders meeting on August 24, 1982 to consider a plan of reorganization. Pursuant to the proposed reorganization, the National Bank of Earlville would merge with the Second National Bank of Earlville, an interim bank formed to facilitate the acquisition of the National Bank of Earlville by NBE Bancshares, Inc., a one-bank holding company. Each share of bank stock would be converted to a share of common stock in the holding company. Dissenting shareholders were entitled to receive the value of their shares upon written request to- the bank within thirty days after consummation of the reorganization.

The proxy statement referred to two members of the bank's board of directors and their followers as "objectors" to the proposed reorganization. The proxy statement estimated that these "objectors" owned 786 shares of 19.65% of the outstanding common stock. The proxy statement also noted:

> Management of the Bank cannot determine whether the Objectors will vote against the Plan at the Special Meeting or pursue their rights as dissenting stockholders.... If the Objectors vote against the Plan and pursue their rights as dissenting shareholders, it is anticipated that they would be entitled to receive approximately $500,000 for their shares.

Proxy statement at 8.

The reorganization plan received the necessary approval of more than two-thirds of the shares of the common stock at the August 24, 1982 meeting. The Office of the Comptroller of the Currency (OCC) approved the merger on August 26, 1982. The plaintiffs voted against the reorganization, surrendered their shares, and requested payment for the value of the shares.

Under 12 U.S.C. § 215a, the value of dissenting shareholders' stock is determined, as of the date of the consummation of the merger, by a committee of three

appraisers: one selected by the bank, one selected by the dissenting shareholders, and one selected by the previously-selected appraisers. 12 U.S.C. § 215a(c). Both the dissenting shareholders and the bank appointed appraisers. These two appraisers, however, were unable to agree on the third appraiser.

The bank then offered the plaintiffs $411.64 per share for each of their shares, a total of $335,721.52 for the 818 shares held by the plaintiffs. The plaintiffs rejected this offer and, on January 3, 1983, requested that the Comptroller of the Currency appraise the shares. The OCC determined the book value, adjusted book value, market value, and investment value of the stock. These values were weighted according to the degree to which the OCC believed they reflected the true value of the stock. Based on these weighted values, the OCC appraised the stock at $336.42 per share.

On September 30, 1983, the plaintiffs' stock was sold at an auction. The bank placed the sole bid of $275,191.56 for the entire block of 818 shares or $336.42 per share. Dissatisfied with the outcome of the appraisal procedure, the plaintiffs filed suit against the bank, the bank holding company, the directors of the bank and bank holding company, (referred to collectively as the "bank defendants"), the Comptroller of the Currency, and two subordinate OCC officers (referred to as the "government defendants" or the "OCC").

Counts I and II of the complaint are directed solely against the government defendants. Count I alleges that 12 U.S.C. § 215a, the federal statute pursuant to which the plaintiff's shares were appraised, is unconstitutional both on its face and as applied, because it deprived the plaintiffs of their property without due process of law and without just compensation in violation of the Fifth Amendment. Count II seeks judicial review of the OCC's appraisal on the ground that the appraised valuation was arbitrary, capricious, and an abuse of discretion.

Count III alleges that the bank defendants violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5, 17 C.F.R. § 240.10b–5, by issuing a proxy statement containing a false and misleading statement as to the amount of money the dissenting shareholders would receive for their shares. Counts IV through VIII, also directed at the bank defendants, are common law tort claims for breach of fiduciary duty in connection with the merger, fraud, unlawful interference with the appraisal process, breach of fiduciary duty at the auction, and conspiracy with the government defendants at the auction. Count IX alleges that the bank defendants violated the Community Reinvestment Act, 12 U.S.C. § 2901. In Count X, the plaintiffs allege that the bank defendants violated section 14(a) of the 1934 Act, 15 U.S.C. § 78n(a), and Rule 14a–9, 17 C.F.R. § 240.14a–9, by issuing proxy statements which contained untrue statements of material fact or failed to state material facts necessary to make the representations in the proxy materials not misleading.

The government defendants have moved for summary judgment on Counts I and II. The bank defendants have moved to dismiss or, in the alternative, for summary judgment on claims based on the federal securities laws, Counts III and X, and the count based on the Community Reinvestment Act, Count IX. The bank defendants also seek dismissal of Counts IV through VIII on the ground that the court lacks jurisdiction over them after dismissal of the federal law claims.

## I. *The Government Defendants*

Counts I and II of the complaint are directed against the OCC. In Count I, the plaintiffs allege that 12 U.S.C. § 215a, on its face and as applied, violates the due process clause and the just compensation clause of the Fifth Amendment. Specifically, plaintiffs allege that the OCC deprived them of their property in several ways: by preventing them from receiving interest and dividends on the money invested in the bank stock from the date of the merger to the date of the bank's payment; by not

providing a due process hearing or other appropriate procedures for appraising the value of the stock; by acting arbitrarily and capriciously and abusing its discretion in appraising the value of the stock, and by depriving plaintiffs of fair and just compensation for their shares of the bank stock. Plaintiffs ask the court to find that the statute and the OCC's appraisal process violate the due process and just compensation clauses.

In Count II, the plaintiffs allege that the OCC's appraisal of the value of the stock was arbitrary and capricious, constituted an abuse of discretion, and was not supported by substantial evidence. Specifically, they allege that the OCC was arbitrary and capricious in its method of valuation, in its refusal to consider the market value or book value, in its extension of time for the defendants to submit materials, in its refusal to consider properly the plaintiffs' appraiser's information, and in taking over six months to issue an appraisal. Therefore, plaintiffs request that the court hold a *de novo* review of the appraisal or, alternatively, find the appraisal arbitrary, capricious, and an abuse of discretion, and order the OCC to make another appraisal. Under either alternative, plaintiffs request that the OCC use plaintiffs' appraisal as the controlling factor in determining the value of the stock.

The OCC has moved for summary judgment in its favor on both Counts I and II. Summary judgment shall be granted where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Black v. Henry Pratt Co.*, 778 F.2d 1278, 1281 (7th Cir.1985). The party moving for summary judgment has the burden of establishing the lack of a genuine issue of material fact. *Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir. 1984). Therefore, the court must view all the evidence in the light most favorable to the non-moving party. *McGraw-Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1167 (7th Cir.1986). Even if the parties do not dispute the basic facts, summa-

ry judgment is not proper if the parties disagree on the inferences which may be reasonably drawn from the undisputed facts. *Central Nat'l Life Ins. v. F & D Co.*, 626 F.2d 537, 539 (7th Cir.1980). In summary judgment cases, the court assumes that all facts as stated by the party opposing summary judgment are true. *Local Beauty Supply, Inc. v. Lamaur, Inc.*, 787 F.2d 1197, 1200 (7th Cir.1986) (citing *Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163, 1167 (7th Cir.1978)).

## A. Standard of Review

■ Plaintiffs urge the court to conduct a *de novo* review of the OCC's appraisal, while the OCC argues that the proper standard for judicial review is the arbitrary and capricious standard. The Seventh Circuit addressed the standard of judicial review of an appraisal of stock by the OCC in *Beerly v. Department of Treasury*, 768 F.2d 942 (7th Cir.1985) *cert. denied*, —— U.S. ——, 106 S.Ct. 1184, 89 L.Ed.2d 301 (1986). It found that the scope of judicial review for an appellate court and the district court were identical—the scope is narrow and deferential. 768 F.2d at 945. The issue is whether the Comptroller's decision was reasonable—not arbitrary, capricious, or an abuse of discretion. *Id.* (citing 5 U.S.C. § 706(2)(A)); *cf. Camp v. Pitts*, 411 U.S. 138, 141–142, 93 S.Ct. 1241, 1243–1244, 36 L.Ed.2d 106 (1973)). *See also Simonds v. Guaranty Bank & Trust Co.*, 492 F.Supp. 1079, 1082 (D.Mass.1979) (citing 5 U.S.C. § 706(2)(A) as proper standard of judicial review of Comptroller's appraisal).

## B. Review of Appraisal

In this case, the OCC's appraisal was the last step of the statutory scheme set out under the National Bank Act, 12 U.S.C. § 215a (1982). Section 215a(a)(2) requires that when two banks merge, two-thirds of the owners of the outstanding stock in the acquired bank and the Comptroller approve the merger. Section 215a(b) entitles shareholders who oppose or dissent to the merger, such as the plaintiffs did here, to receive the value of their stock as of the

effective date of the merger—in this case, as of October 1, 1982. The value of the dissenting shareholders' stock is usually determined by an appraisal committee of three members: one selected by the dissenters, one selected by the acquiring bank, and one selected by the other two members. 12 U.S.C. § 215a(c). The two appraisers in this case could not select the third member. When one committee member is not selected, then an interested person may request an appraisal by the Comptroller to determine the value of the stock. The plaintiffs asked the Comptroller to make such an appraisal and both parties submitted materials and information to the OCC for its consideration.

The National Bank Act provides no guidance for the Comptroller's appraisal procedure. No regulations have been promulgated to establish a method for determining the value of the stock. Therefore, to determine if the OCC's appraisal was reasonable, the court must consider whether the appraisal was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Despite plaintiffs' argument to the contrary, in considering whether the OCC's appraisal was reasonable, the court is resolving a legal, not a factual, question. Therefore, it must determine on the basis of the administrative record, as a matter of law, whether the OCC's appraisal procedure violated the arbitrary and capricious standard.

On January 3, 1983, the dissenters requested the OCC to determine the value of their stock. Administrative Record (A.R.) 1. By letter dated February 2, 1983, the OCC advised the interested parties that it would appraise the stock and that they could submit written information they wished it to consider in appraising the stock. A.R. 8, 9–10. The plaintiffs submitted materials from their appraiser, Mr. Ray E. Reents, and the bank submitted materials from its selected appraiser, Mr.

James R. Bann, who was also the president of the bank, and an opinion letter issued by Bacon, Whipple & Company. A.R. 51, 132. The OCC issued its report of appraisal on July 11, 1983, concluding that as of October 1, 1982, the effective date of the merger, the value of the shares was $336.42 per share. A.R. 206 *et seq.*

Plaintiffs argue that the OCC's appraisal was arbitrary and capricious and analogize the present appraisal to the one invalidated by the court in *Simonds v. Guaranty Bank & Trust Co.*, 492 F.Supp. 1079 (D.Mass.1979). In *Simonds*, the court found the valuation of stock invalid because the OCC had used a "rigid formula" without supplying any rationale for its method of valuation. The OCC had simply taken the average of three sums representing the bank's book value, market value, and investment value without shaping the formula to the particular situation of the specific bank in question. The court concluded:

> [D]efendant Comptroller gave equal weight to each of the three elements of value he considered without articulating his reason for doing so.... In the absence of an explanation of the reason for this course of action ... and in light of the substantial disparity between the third element, "investment value," and the other two, the inference is compelling that the Comptroller was applying a rigid formula rather than exercising his judgment.

*Id.* at 1084.

Plaintiffs contend that the present appraisal, like *Simonds*, must be invalidated as unreasonable, arbitrary, and capricious because (1) the OCC used a rigid formula by disregarding the book value of the shares; (2) the OCC's methodology was irrelevant in that it improperly defined the bank's peer group; and (3) the memorandum of June 13, 1983, (A.R. 327), and the memorandum of July 1, 1983, (Response to Sur-Reply, Ex. 1), indicate that the OCC applied a rigid formula by assigning set

weights to certain elements.[1] The court finds, however, that none of these arguments compel the court to invalidate the OCC's appraisal.

Under the heading "Methods of Valuation," the OCC's appraisal initially notes that several methods may be used to determine the value of the bank shares and that the choice of a method is shaped by the facts present in each case. A.R. 209. The OCC examined four methods of valuing stock: book value, adjusted book value, market value, and investment value. Book value is the difference between the firm's assets and liabilities as valued on its books of account. As of September 30, 1982, the book value per share was $685.62. A.R. 209. The OCC, however, did not give any weight to the book value when it made its appraisal and this decision is the basis of plaintiffs' first argument—that disregarding the book value creates a compelling inference of a rigid, arbitrary formula.

The court finds the decision to disregard the book value does not reflect a rigid formula or an arbitrary approach for the valuation process. The OCC explained that:

> [T]he unadjusted book value is not considered appropriate for two reasons. First, it does not represent the value of the bank as a going concern. Second, because it relies on historical costs whose replacement value has been distorted by inflation and interest rate fluctuations, it does not accurately reflect the current value.

A.R. 213. Therefore, the OCC did not blindly or rigidly reject the book value, but offered a reasonable explanation for the decision to disregard it.

Moreover, the Seventh Circuit has plainly cited the same defects in the use of book value in the appraisal process. In *Beerly*, the court observed:

> Book value is a virtually meaningless index of what a share of stock is worth to the shareholder, and the Comptroller properly disregarded it. The main component of book value is the original cost of the firm's assets, as depreciated. Wholly apart from the well-known vagaries of depreciation, if a firm's assets are specialized to the firm's business they may have very little sale value.

768 F.2d at 946. *See also* Note, *The Valuation of a Close Corporation: Glimpses of Objectivity in an Inflationary Period*, 13 Loy.U.Chi.L.J. 107, 122 (1981); Note, *Valuation of Dissenter's Stock*, 79 Harv. L.Rev. 1453, 1457 (1966). The *Beerly* court found it was proper for the OCC to disregard the unadjusted book value in making its appraisal. In the present case, the court finds the OCC's decision to disregard book value was not a clear error of judgment, but rather a practice approved by this circuit.

Additionally, the *Beerly* court also approved of the OCC's disregard of market value; in the present case, the OCC also decided to give no weight to the market value. The Seventh Circuit reasoned that when stock is traded infrequently or "thinly" traded, its market value may not be a reliable guide to its current value. 768 F.2d at 946.

---

1. Plaintiffs also appear to argue that the OCC arbitrarily and capriciously defined a relevant market area by creating a peer bank group. Mem. in Opp. at 13–14. The court does not understand the appraisal process to require the definition of a relevant market area. The market area in *Southwest Mississippi Bank v. FDIC*, 499 F.Supp. 1 (S.D.Miss.1979), had to be defined as part of the agency's resolution of whether the effect of a proposed bank merger would be substantially to lessen competition in the relevant product market—the business of commercial banking—in the relevant geographic market. The present appraisal of bank stock involved the use of a peer group, but did not require the use of a relevant geographic market. The geographic market functions to define the area where the alleged lessening of competition would be felt. The appraisal at issue here is not concerned with anti-competitive effects as the result of the completed merger; instead, the bank merged with a "paper" bank which became the sole asset of the holding corporation. Therefore, plaintiffs' challenge of the appraisal as arbitrary and capricious because it failed to define or unreasonably defined a relevant geographic market area is inapposite.

The court concludes that the OCC's methods were generally in accord with Seventh Circuit's approach to valuation. Specifically, the OCC's decision to disregard book value was appropriate. The plaintiff's argument that disregard of the book value rendered the appraisal arbitrary and capricious is without merit.

The OCC also examined the adjusted book value method and in doing so, created a peer group consisting of six banks to use for comparative purposes. The selection of the peer group forms the basis for plaintiffs' second argument. They assert that the OCC irrationally selected the peer group and in doing so wrongly defined an essential term and committed reversible error. Again, the court finds plaintiffs' argument does not reveal the appraisal to be arbitrary or capricious.

The OCC, in determining adjusted book value, explained:

> A peer group consisting of six banks was formed for comparative purposes (see Table I, the Peer Group). The selection of these comparable banks was based on their location in the same State Economic Area (a county, or group of counties within a state, that are homogeneous in general livelihood and socio-economic characteristics) as NBE and on total asset size (between $25 million and $100 million).

A.R. 210. Table I included banks in Kankakee, Peru, Morris, and Ottawa, Illinois, with total assets ranging from $29,037,000 to $84,189,000. The OCC did not include two of the five peer banks used by the bank in its appraisal because they had total assets greater than $100 million, and, therefore, would not be appropriate in a comparison peer group. A.R. 212.

The OCC's selection of a peer group was a discretionary act. The term peer group is not defined by the statute; therefore, the selection of an appropriate peer group was a matter within the OCC's judgment. The plaintiffs compare the peer groups selected by the bank, themselves, and the OCC and conclude that the OCC's choices are arbitrary and capricious because they are located in larger towns or in towns with different economies, have much larger assets, and are listed on the National Daily Quotation Service (NDQS). The bank's peer group includes banks with nearly five times the assets of the bank; the plaintiffs' group has banks with only a third or a half of the bank's assets; and the OCC list has banks with nearly equal or over two times the bank's assets. From this aspect alone, it is clear that the selection process is one of individual judgment, and the OCC's list may reflect a more balanced, objective judgment. Additionally, the OCC peer group includes towns with an agricultural economy. If more appraisals had been solicited, different peer banks would appear. On the record before it, this court cannot conclude that the OCC's selection of a peer group was arbitrary, capricious, or unreasonable.

Finally, the plaintiffs argue that the memoranda of June 13, 1983 and July 1, 1983, demonstrate that the OCC applied a rigid formula in making its appraisal. The June 13, 1983 memorandum is a sign-off routing slip for the Earlville appraisal performed by Mr. Studley, on which Reviewer Arnold has written:

> Our usual weights are
> .25 Adj Book Value
> .75 Investment Value
> Why have you chosen to weight them 50/50 in this case.

The memorandum of July 1, 1983 lists stock appraisals performed by Mr. Studley from October 1982 through June 1983. The lists reveal that Mr. Studley had assigned varying weights in his appraisals that generally corresponded to varying "basis" which reflect different factual settings—such as restrictions imposed on the bank by a holding company, the impact of interest rate changes, or volatile earnings.

Plaintiffs argue that the compelling inference to be drawn from the memoranda is that OCC uses a rigid formula which uniformly excludes book and market value and which requires "usual weights" of 25% and 75%. The court is not persuaded that the memoranda render the appraisal pro-

**696**

cess invalid. In *Simonds v. Guaranty Bank & Trust Co.*, the court invalidated the appraisal because the OCC failed to articulate the reasons for the weight given to the elements of value. 492 F.Supp. at 1084. Here, the OCC has articulated rational explanations for its weighting of the four values, and this is not a basis for invalidating the appraisal.

The *Simonds* court, however, also examined a memorandum of OCC staff, such as those present here, to determine if it reflected a rigid formula for determining value. The Kulig memorandum in *Simonds* instructed an OCC staff member that a particular amount could not be considered *at all* in determining the value of the plaintiff's stock. *Id.* at 1084–85. Because the *Simonds* court had already invalidated the appraisal for its lack of an articulated rationale for its weighting, it did not reach whether the Kulig memorandum alone would require invalidation. However, the Kulig memorandum eliminated a whole factor from consideration; while the Arnold memorandum questions the weighting as unusual, it does not require that only certain weights be used since clearly Mr. Studley had, in the past, used varying proportions of weighting. Therefore, the court concludes that the memoranda do not create a compelling inference of a rigid formula which requires the court to invalidate the OCC appraisal.

## C. *Constitutional Claims*

In Count II, the plaintiffs allege that section 215a and the OCC's actions pursuant to it constituted a deprivation of property without due process of law and a taking without just compensation. If such constitutional violations exist, then the court must set the appraisal aside as "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

Plaintiffs assert that "by not providing a due process hearing or other procedures and standards which comport with due process," the statute and the OCC's appraisal deprived them of their property without due process. Complaint at ¶ 51. The parties do not dispute that the stock constitut-

ed property; however, the OCC contends that there was no deprivation. The OCC argues that the government did not intervene to deprive plaintiffs of their stock; rather, the plaintiffs, as a result of the bank's actions, voluntarily came to the OCC to obtain an appraisal of their stock.

Although this court finds merit in the OCC's position that no deprivation has occurred, the argument has been foreclosed by the Seventh Circuit in *Beerly v. Department of Treasury*, 768 F.2d 942, 948 (7th Cir.1985). In *Beerly*, the plaintiff was also a dissenting shareholder who sought appraisal of his shares and who also argued the statutory procedure for appraisal violated the due process clause because it does not provide for an evidentiary hearing. The court found "there was a deprivation of property here." *Id.* It reasoned that:

> If the Comptroller violated due process of law in conducting the appraisal, and as a consequence valued Beerly's stock at less than the minimum reasonable estimate of its true value, the Comptroller could be said to have deprived him of his property without due process of law. It is true that we have found the valuation reasonable, but this conclusion is based on the record compiled by the Comptroller; if that record is tainted by his failure to accord Beerly a hearing, our conclusion is undermined. So we must determine whether the procedure denied Beerly due process.

*Id.*

Similarly, this court must determine if the plaintiffs in this case received due process. To resolve the constitutional sufficiency of the appraisal procedures, the court is required to consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens

that the additional or substitute procedural requirements would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). The plaintiffs have an interest in receiving full value for their bank shares.

■ As to the second factor, the court finds that the procedure used in this case does satisfy due process. The OCC requested both parties to submit material to it, and both parties did submit materials. The OCC acknowledged the receipt of these materials and explained its consideration of them. A.R. 212. It discussed the plaintiffs' submissions, the valuation method used, and the bank's appraisal and the problems with its choice of a peer group. *Id.* The OCC examined the parties' written materials and wrote a reasoned appraisal that encompassed the plaintiffs' submissions and arguments.

Plaintiffs desired a hearing to discuss the selection of the peer group and the question of interest or dividends. The court does not perceive that a hearing would have furthered the accuracy of the stock valuation. The competing suggested peer groups of each party were before the OCC, and the OCC reviewed the statute, found it does not mention interest, and denied an award of interest. Therefore, plaintiffs have not shown how a hearing, with its accompanying time and expense, would have reduced an otherwise high probability of error. Therefore, the statute's lack of provision for a hearing and the OCC's failure to hold a hearing do not deprive plaintiffs of their property without due process of law.

■ Next, plaintiffs assert that because the statute makes no provision for interest and the OCC refused to award interest, they have been unreasonably deprived of their property. The plaintiff in *Beerly* made a similar charge. In *Beerly*, fifteen months elapsed between the effective date of the merger in February 1982 and the OCC's valuation in June 1983. 768 F.2d at 949. The Seventh Circuit found "the delay was not unreasonable." *Id.* In the present case, the merger was effective Oc-

tober 1, 1982 and the appraisal was issued July 11, 1983—nine months later. The court finds the delay of nine months is not unreasonable. Plaintiffs, however, also argue that the term "value" in the statute and the OCC's actions created "a legitimate expectation of a property interest" of which they were deprived without due process.

The plaintiffs do not specify any section of the statute which would create the expectation that interest would be awarded as part of the value of the stock. Section 215a(b) provides that "the value of the shares of any dissenting shareholders shall be ascertained by a committee" or by the Comptroller. The statute, however, does not define value. The court does not read any provision of the statute to imply the right to interest.

Plaintiffs also fail to articulate any acts by the OCC which would create the expectation of an inclusion of interest in the value of the stock. The court has not discovered any rules, regulations, or guidelines promulgated by the OCC which would create the expectation of an interest award. *See Perry v. Sindermann*, 408 U.S. 593, 602, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972). Therefore, the court finds that neither the statute nor the OCC created a legitimate expectation of a property interest.

■ Finally, the plaintiffs contend that the statute and the OCC's actions deprived them of their property without just compensation. The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." The Seventh Circuit, as demonstrated by its view of deprivation of property as expressed in *Beerly*, may conclude that the OCC's appraisal was a taking or deprivation in this instance. However, the court cannot perceive any "public use" to which the plaintiffs' shares were put. Without this requisite element, the plaintiffs' just compensation claim cannot stand. Therefore, summary judgment is granted in favor of the OCC in Counts I and II.

## II. *The Bank Defendants*

The bank defendants have moved to dismiss the federal law counts, Counts III, X, and IX, for failure to state a claim upon which relief can be granted. Dismissal for failure to state a claim is improper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

### A. *Section 10(b) and Rule 10b–5*

Count III of the complaint alleges that the bank defendants violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5, 17 C.F.R. § 240.10b–5, by disseminating a proxy statement which contained a material misrepresentation as to the amount of money dissenting shareholders would be entitled to receive if they chose to pursue their appraisal rights.

Section 10(b) forbids persons to employ in connection with the purchase or sale of any security "any manipulative or deceptive device or contrivance" in contravention of SEC rules and regulations. 15 U.S.C. § 78j. Rule 10b–5 provides in part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> .  .  .  .  .
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

17 C.F.R. § 240.10b–5.

The defendants argue that because the allegedly misleading statement was contained in a proxy statement, the plaintiffs' sole remedy under the federal securities laws is under section 14 of the Securities Exchange Act. Section 14 and related rules regulate proxy solicitations and prohibit the use of fraudulent and misleading statements in the solicitation of proxies. As the Supreme Court made clear in *Securities and Exchange Commission v. National Securities, Inc.,* 393 U.S. 453, 468, 89 S.Ct. 564, 572, 21 L.Ed.2d 668 (1969), the existence or nonexistence of regulation under section 14 does not affect the scope of section 10(b) and Rule 10b–5. The Court stated:

> The two sections of the Act apply to different sets of situations. Section 10(b) applies to all proscribed conduct in connection with a purchase or sale of any security; § 14 applies to all proxy solicitations, whether or not in connection with a purchase or sale. The fact that there may well be some overlap is neither unusual or unfortunate.

*Id.*

█ At the threshold of any action under section 10(b) or Rule 10b–5 is the question of whether the alleged misrepresentations occurred "in connection with the purchase or sale of securities" as that phrase has been interpreted by the courts. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Only a defrauded purchaser or seller of securities has standing to sue under section 10(b) or Rule 10b–5. *Issen v. GSC Enterprises, Inc.,* 508 F.Supp. 1278, 1285 (N.D.Ill.1981) (citing *Wright v. Heizer Corp.,* 560 F.2d 236, 246 (7th Cir.1977), *cert. denied,* 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978)).

In *In re Penn Central Securities Litigation,* 494 F.2d 528, 538–39 (3d Cir.1974), the Third Circuit held that plaintiffs who exchanged shares in the Penn Central railroad for shares in a holding company which, in turn, had the railroad as a wholly-owned subsidiary, had not purchased or sold shares within the meaning of section 10(b). The Third Circuit agreed with the district court's conclusion that the reorganization did not result in a material change in the shareholders' interests and that the transaction was therefore not within the scope of section 10(b).

Relying on the rationale in *Penn Central,* the defendants argue that no pur-

chase or sale of securities occurred here. The plaintiffs in this case are not persons who exchanged shares in one company for shares in the holding company, however; Faced with the prospect of receiving shares in the holding company, the plaintiffs chose to surrender their shares for cash. The nature of their investment changed significantly, from shares of bank stock to cash. Furthermore, numerous cases have found that minority shareholders forced to exchange shares in a corporation pursuant to a merger or "going private" transaction are "sellers" within the meaning of the securities laws, even if the shareholders have not yet tendered their shares at the time the suit is brought. *See Issen*, 508 F.Supp. at 1285 and cases cited therein; *Vine v. Beneficial Finance Co.*, 374 F.2d 627 (2d Cir.1967).

Having determined that the alleged misrepresentation occurred in connection with the purchase or sale of securities, the court turns to the remaining elements of a violation of section 10(b) or Rule 10b–5. These elements include: a material misrepresentation, omission, deception, or manipulation; scienter; and some causal connection between the alleged violation and the injury to the plaintiff. *Issen*, 508 F.Supp. at 1287.

The defendants maintain that the statements in the proxy material did not constitute a misrepresentation as to the amount the dissenting shareholders would receive for their shares. The defendants state that the "proxy statement merely recited that the Bank 'anticipated' that the dissenters 'would be entitled to receive approximately $500,000 for their shares.'"

Both the summary of the proxy statement and the statement itself state that two members of the bank's board of directors and their associates, who owned 786 shares (19.65%) of the outstanding common stock, had voiced objections to the reorganization plan. Under the heading "Possible Dissenting Shareholders," both the summary and the complete proxy statement read:

If the Objectors vote against the Plan and pursue their rights as dissenting stockholders, they will be entitled to receive the value of their shares as of the date the merger is approved by the Comptroller of the Currency. Shares of Bank Common Stock have been trading in a range of $500.00 to $550.00 per share. If the Objectors vote against the Plan and pursue their rights as dissenting stockholders, it is anticipated that they would be entitled to receive *approximately* $500,000 for their shares. Management of the Bank cannot predict whether the Objectors will pursue their rights as dissenting stockholders. (emphasis added).

These statements do not, as the plaintiffs allege, constitute a representation by the bank defendants that the dissenting shareholders would receive $500,000 for their shares. Rather, these statements are the bank's opinion as to a future event—the value of 786 shares of NBE stock on the effective date of the merger. As the proxy statement clearly indicated, the amount ultimately to be paid for dissenters' shares depended on numerous factors which were not known at the time the bank issued the proxy statement. These factors include the effective date of the merger; whether the dissenting shareholders and the bank would agree on the value of the shares; in the absence of such an agreement, the amount of the OCC's appraisal; or the high bid at the auction. Therefore, the statements in the proxy statement were only the bank's opinion as to the value of its shares on a future date and were not a representation on which the plaintiffs were entitled to rely.

To prove a violation of section 10(b) or Rule 10b–5, The plaintiffs must also establish a causal connection between the alleged violation and the injury to the plaintiffs. Ordinarily, a plaintiff must show that he relied to his detriment upon the alleged misrepresentation. Under the circumstances alleged in the complaint, the plaintiffs cannot demonstrate that they sold their bank stock in reliance upon the alleged misrepresentation concerning the

value of the shares. The section 10(b) and Rule 10b–5 claims are therefore fatally flawed.

After reading the proxy statement, including the bank's opinion as to the value of NBE stock on the date the merger would become effective, the plaintiff shareholders decided to vote against the reorganization and pursue their appraisal rights. Before the shares were sold, however, the dissenting shareholders were informed that the OCC appraised the shares at $336.42 each. The dissenters also knew that the bank would place a bid of $275,191.56, $336.42 per share for the 818 shares held by dissenting shareholders. The dissenting shareholders knew that the bank would bid $336.42 per share and that if no one placed a higher bid, the shares would be sold for that amount. They also knew they could retain their shares simply by placing a higher bid. Therefore, the plaintiffs cannot establish that they sold their shares in reliance upon the alleged representation in the proxy statement that they were entitled to over $600 per share.

In their briefs, the plaintiffs identify numerous other statements which they believe were false and in violation of section 10(b) and Rule 10b–5. These statements include representations by the bank's attorney that dissenting shareholders would receive close to book value for their shares, statements in the proxy materials that the bank stock had been trading for $500–550 per share, and several alleged breaches of fiduciary duties. These matters are not alleged in this complaint as the basis of a section 10(b) or a Rule 10b–5 action. In ruling on a motion to dismiss, the court cannot consider the legal sufficiency of statements not contained in the complaint, nor can the plaintiffs amend their complaint through statements made in briefs and affidavits in opposition to a motion to dismiss. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984).

### B. *Section 14(a) and Rule 14a–9*

Section 14(a) of the 1934 Act makes it unlawful to solicit proxies in contravention of SEC rules. 15 U.S.C. § 78 n(a). Rule 14a–9 prohibits solicitations "containing any statement which ... is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not misleading." 17 C.F.R. § 240.-14a–9.

Section 14 protects the integrity of corporate sufferage. *In re Penn Central Securities Litigation*, 347 F.Supp. 1327, 1341 (E.D.Pa.1972). The Supreme Court has stated that "(t)he purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *J.I. Case v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964).

■ In Count X, the plaintiffs allege that the defendants violated section 14(a) and Rule 14a–9 by soliciting proxies through proxy materials containing untrue statements of material fact. The plaintiffs further allege that they relied on disclosures made in the proxy statements and were injured by not receiving for the shares the value represented in the proxy materials and by foregoing their rights to attempt to enjoin the merger.

Count X does not state a claim under § 14(a) or Rule 14a–9 because the plaintiffs do not allege any injury to their corporate voting rights or any injury resulting from a corporate transaction approved on the basis of misleading proxy material. The plaintiffs contend that the misleading proxy statement induced them to vote against the reorganization. The reorganization was approved, however, despite their contrary votes; no one who voted in favor of the merger has complained of any injury.

### C. *The Community Reinvestment Act*

Count IX of the complaint alleges that the bank defendants violated the Community Reinvestment Act, 12 U.S.C. § 2901, and in so doing, breached their fiduciary duties to the plaintiffs. The defendants argue that this count must be dismissed because no private right of action exists under 12 U.S.C. § 2901. Apparently conceding that no private right of action exists under the

federal statute, the plaintiffs maintain that Count IX states a claim for breach of fiduciary duty under state law. The court will therefore not address the merits of this particular claim, but will instead address the question of its jurisdiction over all of the state law claims.

### III. *State Law Claims*

Counts IV through IX allege pendent state law causes of action, including breach of fiduciary duty, fraud, misrepresentation, and conspiracy. When federal claims are dismissed or terminated by summary judgment before trial, the district court must ordinarily relinquish jurisdiction of any pendent state law claim. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.,* 781 F.2d 604, 611 (7th Cir. 1986). A district court may, however, retain jurisdiction over the state law claims if there are pressing reasons for so doing, such as the running of the statute of limitations for filing the pendent claims in state court. *Blau Plumbing,* 781 F.2d at 611–12. No pressing reasons for retaining jurisdiction over the state law claims appear here. The state claims, therefore, will be dismissed without prejudice. Plaintiffs may seek reinstatement of the state claims only by demonstrating a recognized exception which requires the federal court to exercise jurisdiction over these claims.