NoDAK BANCORPORATION, a North
Dakota Corporation, Appellee,

v.

Robert L. CLARKE, Comptroller of
the Currency of the United
States, Defendant,

Liberty National Bank and Trust Com-
pany; Dickinson Bancorporation,
Appellants (Two Cases).

NoDAK BANCORPORATION, a North
Dakota Corporation, Appellee,

v.

Robert L. CLARKE, Comptroller of
the Currency of the United
States, Appellant,

Liberty National Bank and Trust Com-
pany; Dickinson Bancorporation,
Defendants (Two Cases).

Nos. 92–2502, 92–2505, 92–
2508 and 92–2509.

United States Court of Appeals,
Eighth Circuit.

Submitted March 15, 1993.

Decided July 7, 1993.

Mark B. Stern, U.S. Dept. of Justice, Washington, DC, argued (Stuart M. Gerson and Barbara C. Biddle, U.S. Dept. of Justice, Washington, DC and Stephen D. Easton,

U.S. Atty., Fargo, ND, on the brief), for appellant Robert Clarke.

Laurence R. Waldoch, Minneapolis, MN, argued (Timothy A. Priebe and Paul G. Kloster, Dickinson, ND, on the brief), for appellants Liberty Nat., et al.

Edward F. Fox, St. Paul, MN, argued (Mark W. Haigh, St. Paul, MN and Bruce H. Carlson, Fargo, ND, on the brief), for appellee.

Before MAGILL, Circuit Judge, HEANEY, Senior Circuit Judge, and HANSEN, Circuit Judge.

MAGILL, Circuit Judge.

This is an appeal from a district court decision granting summary judgment in favor of NoDak Bancorporation. The district court reversed the Office of the Comptroller of the Currency's approval of a proposed merger between two national banks in North Dakota. This case requires us to resolve one distinct legal issue of first impression for this court. The issue is whether a merger in which the minority shareholders of the acquired bank are forced to accept only cash in exchange for their acquired shares is inconsistent with the National Bank Act.[1] We hold that such a merger is not inconsistent with the National Bank Act, and we reverse the decision of the district court and remand for further proceedings.

## I.

Liberty National Bank and Trust Company of Dickinson (Liberty) has been operating as a national bank in the State of North Dakota since 1916. Prior to the merger at issue, Dickinson Bancorporation, Inc. (Dickinson), a bank holding company, owned 73% of Liberty's outstanding shares. NoDak Bancorporation (NoDak), also a bank holding company, owned 21% of Liberty's outstanding shares. Private individuals owned the remaining 6%.

On January 25, 1990, Liberty's board of directors voted to approve a plan of reorgani-

---

1. Such mergers have been described variously as "take out," "squeeze out" or "freeze out" mergers. *See* Elliott J. Weiss, *The Law of Take Out Mergers: A Historical Perspective,* 56 N.Y.U.L.Rev. 624, 625 n. 3 (1981).

zation and merger. Under the plan, the existing Liberty bank would merge with an interim bank called the New Liberty National Bank (New Liberty), which was a wholly-owned subsidiary of Dickinson, created for the sole purpose of facilitating the merger. The resulting bank would then operate under the existing name of Liberty National Bank and Trust Company and would assume all the operations of the original Liberty. The resulting bank would also be a wholly-owned subsidiary of Dickinson because the minority shareholders in the original Liberty would be entitled to exchange their shares only for cash, leaving Dickinson as the sole shareholder of Liberty bank after the merger. NoDak objected to this plan because it did not wish to have its interest cashed out.

In compliance with 12 U.S.C. § 215a of the National Bank Act, Liberty initiated action to seek approval of the proposed merger before the Office of the Comptroller of the Currency (Comptroller) in March of 1990. NoDak filed written objections to the plan with the Comptroller. Specifically, NoDak argued that (1) the proposed merger lacked a legitimate business purpose, (2) Liberty's majority shareholders had breached their fiduciary duties to the minority shareholders, and (3) the plan would result in a squeeze out of the minority shareholders for less than fair value.[2]

The Comptroller considered NoDak's objections and responded to them in a memorandum dated July 13, 1990. The Comptroller applied the business judgment rule in rejecting NoDak's argument that the merger lacked a legitimate business purpose. Also, the Comptroller found that all the proper evaluative factors required by the National Bank Act had been addressed and the decision of the directors was made with a valid business purpose. With respect to NoDak's breach of fiduciary duties contention, the Comptroller found that the merger plan met all the procedural requirements of the National Bank Act, 12 U.S.C. § 215a(a) and (b), and the Comptroller would not impose additional requirements. As to NoDak's claim that its interest was being squeezed out for insufficient value, the Comptroller noted that 12 U.S.C. § 215a(c) provides a comprehensive process to appraise the value of shares and that NoDak would be amply protected.

On August 10, 1990, the Comptroller granted preliminary approval to Liberty's proposed plan. On October 26, 1990, NoDak asked the Comptroller to reconsider its decision in light of a recently decided case, *Lewis v. Clark*, 911 F.2d 1558 (11th Cir.1990) (per curiam). On March 5, 1991, the Comptroller rejected NoDak's request for reconsideration explaining that the approval of the merger was proper in light of the substantive and procedural provisions of the National Bank Act and the *Lewis* decision did not change that conclusion. The merger ultimately took place in January of 1991.

This action was commenced in June 1991. NoDak alleged that the Comptroller's approval of the merger was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. Specifically, NoDak contends that the merger violated 12 U.S.C. § 215a because it did not grant the minority shareholders of the old Liberty any possibility of receiving shares in New Liberty or Dickinson. NoDak contends that this was an abuse of the minority shareholders' statutory rights.

The district court granted summary judgment in favor of NoDak. In a brief opinion, the district court adopted the rationale and holding of *Lewis v. Clark*, 911 F.2d 1558. It held that the Comptroller lacked authority to approve the merger and reorganization plan because it froze out the minority shareholders. The Comptroller, the resulting Liberty bank, and Dickinson (collectively appellants) appeal.

## II.

We review a grant of summary judgment de novo. *United States ex rel.*

---

2. In addition, in March 1990, NoDak commenced a state action in the North Dakota courts against the majority shareholder of Dickinson, F.L. Clarkson, alleging a breach of fiduciary duties and entitlement to a substantial dividend.

The state action was ultimately dismissed on the ground that the matter was preempted by the pending application before the Comptroller. *See NoDak Bancorporation v. Clarkson*, 471 N.W.2d 140 (N.D.1991).

*Glass v. Medtronic, Inc.,* 957 F.2d 605, 607 (8th Cir.1992). The well-known standard in this case is whether the Comptroller's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). Although we owe no deference to the district court's legal conclusions about the National Bank Act, *see First Nat'l Bank of Fayetteville v. Smith,* 508 F.2d 1371, 1374 (8th Cir.1974), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975), we note that " '[t]he Comptroller of the Currency's interpretation of the National Bank Act is entitled to great deference.' " *Independent Bankers Ass'n of Am. v. Clarke,* 917 F.2d 1126, 1129 (8th Cir.1990) (quoting *Arkansas State Bank Comm'r v. Resolution Trust Corp.,* 911 F.2d 161, 174 (8th Cir. 1990)).

After examining the statute itself, the federal regulations, the legislative history, and the case law interpreting this statute, we hold that the statute should be read to permit the merger in question here and the Comptroller therefore had the authority to approve it.

## A. The Statute

Our point of departure is the National Bank Act section governing mergers of national banks, 12 U.S.C. § 215a. This section states: "One or more national banking associations or one or more State banks, with the approval of the Comptroller, under an agreement not inconsistent with this subchapter, may merge into a national banking association located within the same State, under the charter of the receiving association." 12 U.S.C. § 215a(a). It is significant that the statutory language uses a double negative, allowing any type of merger agreement "not inconsistent with this subchapter." The specific plan of merger seeking to be approved therefore need not be explicitly allowed by this section; it simply must not be inconsistent with the provisions of the statute.

The statute requires the merger agreement to specify "the amount of stock (if any) to be allocated, and cash (if any) to be paid, to the shareholders of the association or State bank being merged into the receiving association." 12 U.S.C. § 215a(a)(3). Section 215a(b) provides that if a shareholder of the acquired bank dissents from a proposed merger, the shareholder shall be entitled to receive the cash value of the shares held. Section 215a(c) provides for a detailed method of appraisal for the dissenting shareholders' interest.[3] Section 215a(d) provides that the receiving association shall promptly pay the dissenting shareholders the ascertained value of their shares. This section also states: "The shares of stock of the receiving association which would have been delivered to such dissenting shareholders had they not requested payment shall be sold by the receiving association at an advertised public auction . . . ." 12 U.S.C. § 215a(d). Further, this section provides that any excess of the auction sale price versus the appraisal amount paid to the dissenting shareholders shall be paid over to the dissenting shareholders. *Id.*

Appellants contend that 12 U.S.C. § 215a(a)(3), which specifically mentions both stock and cash as acceptable methods of compensation, compels the conclusion that minority freeze out mergers are acceptable under the National Bank Act. If cash can be given in exchange for the acquired bank's stock, appellants argue, then the statute clearly anticipates freeze out merger scenarios. No-Dak counters that this subsection does not specifically allow an acquiring bank to give stock in exchange for some of the acquired bank's shares and at the same time give cash to eliminate other shares of the same class of stock. Further, NoDak argues that the auction provision of 12 U.S.C. § 215a(d) renders the idea of a minority freeze out merger inconsistent with the statutory scheme. No-

---

3. Under the original merger proposal, NoDak was offered $1644 per share for its interest. An independent appraisal of old Liberty bank stock generated that figure. The merger agreement was later amended to provide NoDak with $1790 per share for its interest. NoDak ultimately exercised its rights under § 215a(c) to get a final and binding appraisal from the Comptroller. On January 29, 1992, the Comptroller appraised No-Dak's shares at $2,215.67 each, for a total value of $1,870,025.48.

Dak finally argues that the overriding purpose of § 215a is to protect minority shareholders' rights and that a freeze out merger represents an abuse of those rights which is inherently unfair and contrary to the legislative intent.

We acknowledge that 12 U.S.C. § 215a(a)(3) is susceptible to the two different readings offered by the litigants in this case. It is true that the statute does not explicitly address freeze out mergers. Therefore, we proceed under the second prong of the analysis outlined in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984): The statute could be interpreted to mean that cash may only be used when the acquired shareholders affirmatively vote to exchange stock for cash. However, the language could also be interpreted another way. Because cash is listed as an acceptable method of compensation, the language can be read to authorize freeze out mergers. *See* Weiss, *supra* note 1, at 632–33 (noting this same ambiguity in early state corporate merger statutes). Both are reasonable views. However, the statute does not have to specifically allow freeze out mergers for them to be acceptable. They only need to be not inconsistent with the statute taken as a whole.

We find the appellants' reading of the statute to be the more logical one. For freeze out mergers to be inconsistent with the statute, there must be some indication that Congress did not approve of this scenario. There is nothing in the language of the statute itself which forbids the acquiring bank to give minority shareholders of the acquired bank cash alone. The plain language gives no such indication. Moreover, the language of 12 U.S.C. § 215a(a)(3) clearly anticipates that cash may be used, and there is nothing to suggest that it may not be used in combination with stock. By placing these two forms of compensation in the same sentence each followed by the parenthetical phrase "(if any)," it is certainly not unreasonable of the Comptroller to interpret the statute to allow that stock may be exchanged for some acquired shares while cash may be exchanged for others. Therefore, the plain language of the statute inclines us towards appellants' view. Furthermore, the regulations, legislative history, and case law support this interpretation.

NoDak argues that the public auction provision of 12 U.S.C. § 215a(d) makes the idea of a freeze out merger inconsistent with the statute. In such an auction the shares "which would have been delivered to such dissenting shareholders had they not requested payment" are to be sold to the highest bidder. Under NoDak's interpretation, this section requires that dissenting shareholders necessarily be given the opportunity to bid at auction on the stock they would be entitled to receive had they not been offered cash alone. Accordingly, NoDak concludes, dissenting shareholders should never be allowed to be forcibly cashed out because they always retain the right to purchase their stock back at auction.

We are unconvinced by NoDak's argument. By its plain language the auction provision applies only when the dissenting shareholders have initially been *offered* stock but have rejected it and have *requested* payment in cash. This section does not address a situation where the dissenters have not been offered stock and are offered only cash instead. In this merger the dissenters have not chosen cash. Rather, they would like to retain their equity interest. The statute does not address this scenario, and, therefore, the statute does not forbid it.

Moreover, we find it a more logical reading of the statute to omit this particular provision as inapplicable to the specifics of this case. By virtue of its language permitting merger proposals as long as they are "not inconsistent" with this section, the statute was clearly not intended to address every conceivable merger plan. In interpreting the different sections of the statute, they must be considered in this light. The statute does contain a mandatory appraisal process that must be undertaken to value the existing stock of dissenting shareholders under any possible scenario. 12 U.S.C. § 215a(c). However, the auction provision is more circumscribed, applying only to the "shares of stock of the receiving association which

would have been delivered to dissenting shareholders had they not requested payment." 12 U.S.C. § 215a(d). Thus, the appraisal provisions of § 215a(c) apply to shares currently held by dissenters and accordingly must apply in every contemplated transaction because dissenters will always be shareholders initially. However, the auction provision, on the other hand, does not necessarily apply to every transaction. It applies only when shares would have been delivered to dissenters had they not requested cash. This particular merger plan never included an offer of stock to the dissenting shareholders and never included a request for cash. Therefore, we need not reach the auction provision. The minority shareholders still are adequately protected by the mandatory appraisal provisions for their existing stock under 12 U.S.C. § 215a(c).

### B. The Federal Regulations

12 C.F.R. § 5.33, entitled "Merger, consolidation, purchase and assumption," states: "A merger which would not have a substantially adverse effect on competition and which would be beneficial to the merging banks and to the public normally will be approved." 12 C.F.R. § 5.33(b)(1). It then lists six factors to be considered in evaluating a merger application:

(i) The effect of the transaction upon competition;

(ii) The convenience and needs of the community to be served;

(iii) The financial history of the merging banks;

(iv) The condition of the merging banks, including capital, management and earnings prospects;

(v) The existence of insider transactions; and

(vi) The adequacy of disclosure of the terms of the merger.

12 C.F.R. § 5.33(b)(2). These evaluative factors pointedly do not include consideration of any vested rights that minority shareholders conceivably have to retain their shares in the surviving entity. 12 C.F.R. § 5.33(c), entitled "Policy on treatment of minority shareholders in mergers and consolidations," is reserved for future use. There is no indication from this regulation that freeze out mergers are inconsistent with the statute.

12 C.F.R. § 5.21, entitled "Organization of an interim national bank," is also directly relevant to the specific merger at issue. This section states: "An interim national bank is a new national bank which is organized solely to facilitate the creation of a bank holding company or the acquisition of 100 percent of the voting shares of a bank." 12 C.F.R. § 5.21(a). In announcing this rule, the Comptroller stated that it was extremely difficult for a bank holding company to obtain 100% ownership of a bank's stock via a straight tender offer. 46 Fed.Reg. 16,661 (Mar. 13, 1981). Therefore, the rule was revised in order to "eliminate duplication and delay in charter applications filed solely to facilitate ... the acquisition of 100 percent of the outstanding voting shares of an existing bank." *Id.*

■ 12 C.F.R. § 5.21(a) clearly contemplates a bank holding company's attaining 100% ownership of a national bank, and the Comptroller in its rulemaking has sought to streamline the process by which such an acquisition occurs. A freeze out merger is a common method of attaining 100% ownership. The Comptroller, through these regulations, has not indicated any antipathy towards freeze out mergers. On the contrary, the Comptroller has actually passed rules designed to expedite 100% ownership. By facilitating the use of interim bank mergers and by refusing affirmatively to forbid interim bank mergers that involve a freeze out of minority shareholders (such as the merger we have here), we conclude that the Comptroller has effectively sanctioned the use of freeze out mergers. Therefore, in its own interpretation of the statute, the Comptroller has clearly not expressed any disapproval of freeze out mergers, but has essentially endorsed them.

■ "Considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782. This court should not disturb an agency's interpretation, "unless it appears from the statute or its legislative

history that the accommodation is not one that Congress would have sanctioned." *Id.* at 845, 104 S.Ct. at 2783 (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). Based on our reading of the statute and the federal regulations, we find no reason to depart from the Comptroller's interpretation.

### C. The Legislative History

NoDak argues that the National Bank Act's legislative history does not support the conclusion that freeze out mergers are acceptable. We cannot agree. NoDak assumes that there must be a specific statement in the legislative history endorsing freeze out mergers for them to be acceptable. As already discussed, we think the proper inquiry is whether there is anything in the legislative history suggesting that freeze out mergers are inconsistent with the statutory scheme. The legislative history contains no direct statements about freeze out mergers, either for or against. The legislative history does, however, reveal Congress' desire to facilitate national bank mergers and consolidation which supports our interpretation of the statute.

When the National Bank Act section governing bank mergers and consolidations was originally enacted in 1918, Congress intended to simplify the consolidation of national banks. The House Report stated:

It is the purpose of this bill to remove the necessity of liquidation and permit the consolidation to take place upon the affirmative vote of the stockholders of each association, such consolidations being permitted under the charter of either of the existing banks. Proper provision is made by the proposed law to protect any dissenting stockholder in either corporation, who does not desire to be connected with the consolidated bank.

H.R.Rep. No. 408 to accompany H.R.Rep. No. 10205, 65th Cong., 2d Sess. (1918). This statement indicates Congress' willingness to facilitate mergers and consolidations. Congress' stated purpose was to make it easier for banks to consolidate.

When 12 U.S.C. § 215a(b) was amended in 1952, Congress' motivation was to bring the National Bank Act into parity with state statutes. Prior to 1952, the federal law allowed that *any* shareholder dissenting to the proposed merger could obtain cash value for the held shares—both the dissenters holding the acquired bank stock and dissenters who held the acquiring bank stock. Many state statutes provided that only dissenters who held acquired bank shares were entitled to cash appraisal rights. Therefore, there was a disadvantage to consolidating under federal law as opposed to state law because of the greater possibility of having to pay appraisal value to dissenters. Congress enacted the change in 12 U.S.C. § 215a(b) to ensure parity between the federal and state systems by allowing appraisal rights only to dissenters who had held stock in the acquired bank. *See* H.R.Rep. No. 2421, 82d Cong., 2d Sess., *reprinted in* 1952 U.S.C.C.A.N. 2133. This legislative history again reveals Congress' desire to make it easier for federal banks to consolidate and to encourage efficient transactions.

Similarly, when the National Bank Act was last amended in 1959, the Senate Report declared that the amendments

were intended only to improve the procedural and technical provisions relating to consolidations and mergers. The committee did not intend to affect in any way the substantive authority of banks to consolidate or merge, or the substantive authority of the Comptroller of the Currency to review and approve such considerations and mergers.

S.Rep. No. 730, 86th Cong., 1st Sess. 6, *reprinted in* 1959 U.S.C.C.A.N. 2232, 2237. These improvements sought to "eliminate ambiguities" in the procedural requirements. *Id.* Again, Congress sought to simplify and expedite the consolidation process.

 Congress' intent to encourage bank consolidation is furthered by interpreting the National Bank Act to allow freeze out mergers. Freeze out mergers facilitate 100% ownership, which in turn affords a bank greater flexibility and expedites consolidation. Disallowing freeze out mergers would mean that minority shareholders could hold up an efficient consolidation or merger trans-

action by refusing to give their consent or by dissenting and then buying back their shares at auction to maintain the status quo. Although a proposed merger could be beneficial to the majority of the shareholders, one dissenter could effectively veto it by stonewalling any plan it did not like. Such a situation would not encourage bank consolidation, it would stifle it. It would be contrary to Congress' purpose of facilitating and expediting national bank consolidation to allow minority shareholders to veto a proposed plan which the majority of stockholders of the acquiring and the acquired bank have approved.

■ NoDak argues that the true purpose of the statute was to protect minority shareholder rights and a freeze out merger violates that purpose. Protection of minority interests is certainly one purpose of the statute, but Congress' chosen means of protection is the appraisal process of 12 U.S.C. § 215a(c) and, when applicable, the auction provision of 12 U.S.C. § 215a(d). Without any further indication from Congress, we must conclude that Congress deemed the appraisal process adequate protection for minority shareholders in a situation such as this because it is the only mandatory provision. This court will not read into the statute greater rights for the minority than those protections the legislature specifically provided.

### D. The Case Law

The district court based its opinion wholly on *Lewis v. Clark,* 911 F.2d 1558 (11th Cir. 1990) (per curiam). The *Lewis* court wrote, "[w]e can find no authority that permits a majority of the stockholders to freeze out minority shareholders by requiring them to take cash over their objection thus permitting the majority to become 100% owners of the merged corporation." *Lewis,* 911 F.2d at 1560. The court held, "without express statutory authority, the Comptroller has no authority to approve a merger which requires holders of stock of equal standing to take

different forms of consideration." *Id.* at 1561.[4]

■ We disagree with the *Lewis* court's conclusion because we believe it improperly framed the inquiry. The question is not whether there is explicit authority to allow freeze out mergers; the question is whether freeze out mergers are inconsistent with the National Bank Act. There need not be explicit authority as long as all the existing requirements of the National Bank Act are satisfied. The *Lewis* court acknowledged the argument that nothing in the statute prohibits freeze out mergers, but stated, "[t]his, however, overlooks the basic thesis that if owners of the same class of stock are to be treated differently, there should be some specific decision to that effect by Congress." *Id.* We disagree. Congress decided to enact a statute with explicit protections for minority shareholders in the form of ample appraisal rights, but Congress did not wish to prohibit the use of cash as a method of exchange in mergers. In our view, if Congress wished to prohibit this type of merger, it could have done so and may still do so through amendments. Until it does, however, it is not inconsistent with the existing law as written and as reasonably interpreted by the Comptroller.

The *Lewis* court also refers to a "longstanding equity tradition of protection of minority shareholders in American jurisprudence." *Id.* (citing *Southern Pac. Co. v. Bogert,* 250 U.S. 483, 487–88, 39 S.Ct. 533, 535–36, 63 L.Ed. 1099 (1919)). We agree that there was such a tradition at one point, but the law has evolved away from that tradition and the modern view is to allow freeze out mergers. *See* Weiss, *supra* note 1, at 690–91. In describing this evolution, commentators have noted:

It used to be very difficult to force a shareholder to disinvest involuntarily, because courts viewed shares as vested rights that could not be taken without

---

4. We note that *Lewis* involved the merger of a national bank and a state bank, whereas this case involves two national banks. Therefore, the cases are distinguishable on their facts. The National Bank Act stipulates that with consolidations involving state banks, "no such merger

shall be in contravention of the law of the State under which such bank is incorporated." 12 U.S.C. § 215a(d). For the purposes of this case, however, the relevant *Lewis* holding seems to be based on federal and not state law.

consent. Because this rule of unanimity created intolerable holdout problems and frustrated many efficient corporate transactions, it was jettisoned in favor of a rule that allowed the majority to freeze·out minority shareholders. Under the modern view, the shareholders' only entitlement is to demand an appraisal of their shares, a remedy that does not give dissenting shareholders any element of value attributable to the transaction from which they dissent.

Frank H. Easterbrook & Daniel R. Fischel, The Economic Structure of Corporate Law 134 (1991). In discussing the older view, one contemporary court has described the "notion that minority shareholders have a vested right in corporate participation" as "discredited." *Coleman. v. Taub*, 638 F.2d 628, 634 (3d Cir.1981). Similarly, that court observed that "the common-law rule that gave each shareholder the power to veto a merger" was "equally obsolete." *Id.* at 634 n. 6. Although these comments are directed specifically towards corporate reorganization law and not banking statutes, the issue is the same. Because banks are frequent participants in such freeze out mergers, the same reasoning applies. *See, e.g., Virginia Bankshares, Inc. v. Sandberg,* —— U.S. ——, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (example of freeze out merger involving banks).

This court chooses not to cling to an outmoded view of merger law that necessitates a strained reading of the relevant statute. Rather, this court embraces the modern view that comports more naturally with the language of the statute itself, the legislative history, and the regulations enacted by the administrative agency legitimately entrusted with interpreting the statute.

*Lewis* has been the only court to address this specific issue of minority shareholder rights in freeze out mergers directly. However, decisions of other courts on related merger issues also lend support to our reading of the statute. In *Bloomington Nat'l Bank v. Telfer*, 699 F.Supp. 190 (S.D.Ind. 1988), *aff'd*, 916 F.2d 1305 (7th Cir.1990), the court held that an attempt by a bank holding company to gain 100% ownership of a bank through a reorganization of the bank's capital structure involving a reverse stock split violated 12 U.S.C. § 83. The effect of the reorganization attempted in *Telfer* was to freeze out minority shareholders without affording them appraisal rights. The court observed:

Other sections of the National Bank Act make it clear that Congress is concerned with protecting the interests of minority shareholders in a bank and that when minority shareholders are in a position to be eliminated, Congress intends for them to have appraisal rights. *See* 12 U.S.C. §§ 214a–215a. As reflected in *Beerly v. Department of the Treasury*, 768 F.2d 942 (7th Cir.1985), *cert. denied*, 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 301 (1986), and in *Nehring v. First DeKalb Bancshares, Inc.*, 692 F.2d 1138 (7th Cir.1982), these sections of the Act provide a way for a national bank that wants to become a wholly-owned subsidiary of a holding company to do so and cash out minority shareholders in full compliance with the law. However, a restructuring pursuant to 12 U.S.C. § 215a requires that dissenters have appraisal rights.

*Bloomington Nat'l Bank v. Telfer*, 699 F.Supp. at 194 (footnote omitted). This language reinforces our conclusion that freeze out mergers are completely acceptable as long as the dissenting shareholders are given their appropriate appraisal remedy. In the merger at issue here, full appraisal rights were afforded to the minority shareholders in complete accord with the intention of Congress.

Other courts have recognized the economic truism that "there is a big difference between the value of a minority shareholder's interest and the value of a controlling interest...." *Beerly*, 768 F.2d at 946; *Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1554 (10th Cir.1992). The *Beerly* court went on to note:

Of course the analysis would be more complicated if a buyer were not allowed to pay a premium for a controlling block of stock—if he had to pay all shareholders the same price for their shares. But federal law contains no such requirement, which would make transfers of corporate control more costly and therefore reduce

the effectiveness of the market for corporate control in disciplining management and in moving corporate resources into the hands of those who can get the most value out of them.

*Beerly,* 768 F.2d at 947 (citing Frank H. Easterbrook and Daniel R. Fischel, *Corporate Control Transactions,* 91 Yale L.J. 698 (1982)).

This passage provides an apt framework for considering the transaction at issue here. In its effort to gain 100% ownership of Liberty, Dickinson knew that the shares held by the minority were not as valuable as the shares it held as the majority stockholder. Dickinson, by virtue of its majority control position, could legally structure a transaction which gave the minority shareholders something different (cash) for their shares than it gave for the shares of the majority (stock) because the National Bank Act does not forbid this. The National Bank Act does demand that the amount of cash the minority receives is a fair appraisal of the value of its interest and it sets out appraisal rules to ensure this. The specific rules concerning the appraisal process were followed here.

### III.

The National Bank Act by its terms does not forbid freeze out mergers. The Comptroller has interpreted the Act to allow freeze out mergers provided adequate appraisal occurs. "[C]ourts should defer to an agency's construction of its own statutory mandate." *Board of Governors of the Fed. Reserve Sys. v. First Lincolnwood Corp.,* 439 U.S. 234, 251, 99 S.Ct. 505, 514, 58 L.Ed.2d 484 (1978). The Supreme Court has recognized, "[t]he Comptroller of the Currency is charged with the enforcement of banking laws to an extent that warrants the invocation of this principle with respect to his deliberative conclusions as to the meaning of these laws." *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 403–04, 107 S.Ct. 750, 759, 93 L.Ed.2d 757 (1987) (quoting *Investment Co. Inst. v. Camp,* 401 U.S. 617, 627, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971)). We conclude that freeze out mergers are not inconsistent with the National Bank Act and the Comptroller had authority to approve this transaction. Summary judgment was therefore improper in this case.

Based on the foregoing, we reverse the decision of the district court and remand for reconsideration in light of this opinion.

HEANEY, Senior Circuit Judge, dissenting.

In this appeal, NoDak asks simply that it be given the same rights as Liberty's majority shareholder. Because the court today ignores Congress's longstanding interest in protecting minority shareholders' rights and allows an acquiring bank to treat minority shareholders differently than majority shareholders, I respectfully dissent.

The court correctly notes that the statute provides little help on this issue. In interpreting what the statute will or will not allow, however, we routinely consider the tradition that existed prior to the enactment of the statute in the expectation that should Congress intend to jettison such tradition, it will do so expressly. In this case, as noted by the Eleventh Circuit in *Lewis v. Clark,* 911 F.2d 1558, 1561 (11th Cir.1990) (per curiam), we are dealing with "a longstanding equity tradition of protection of minority shareholders in American jurisprudence." "I am convinced that Congress was aware of this tradition, and that if it had intended to depart from it, it would have left more traces of that intention than the [majority] has been able to find." *Aaron v. SEC,* 446 U.S. 680, 712, 100 S.Ct. 1945, 1964, 64 L.Ed.2d 611 (1980) (Blackmun, J., concurring and dissenting). The majority has, in fact, found no traces that Congress intended to depart from this tradition, but bases its inequitable treatment of the minority shareholder in this case on an unjustified obeisance to the Chicago School of Economics. The Comptroller's reading of the statute is equally untenable.

Quoting Easterbrook and Fischel, the court determines that any such tradition has since been "jettisoned in favor of a rule that allow[s] the majority to freeze out minority shareholders." *Supra* at 1424. What both the court and the Comptroller do, then, is determine what the Congress might do today given trends in the law since passage of the National Bank Act. I choose to consider what Congress had in mind when the Bank Act was passed, and in so doing, look to the longstanding tradition of protecting minority shareholders' rights that existed at the time.

Those rights include the right to be treated on the same basis as the majority shareholder. Had Congress intended to allow minority shareholders to be forced to accept cash while allowing the majority to receive stock, it would have done so expressly. As it did not do so, I join the Eleventh Circuit in its belief that Congress would not have sanctioned such a merger and that "without express statutory authority, the Comptroller has no authority to approve a merger [that] requires holders of stock of equal standing to take different forms of consideration." *Lewis*, 911 F.2d at 1561. Consequently, I dissent.