Mark H. BERENS, Plaintiff–Appellant,

v.

Eugene A. LUDWIG, Comptroller of the Currency, and Marquette Bank, N.A., as successor in interest to Marquette Bank Shakopee, N.A., Defendants–Appellees.

No. 97–3545.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 29, 1998.

Decided Nov. 17, 1998.

Richard M. Carbonara, Jeffrey P. DeJong, W. Bruce Hoff, Mark H. Berens (argued), Altheimer & Gray, Chicago, IL, for Mark H. Berens.

James M. Kuhn, Office of the United States Attorney, Chicago, IL; Kenneth J. Lennon, Cory C. Caouette (argued), Office of the Comptroller of the Currency, Washington, DC, for Eugene A. Ludwig.

Barry S. Rosen (argued), Sachnoff & Weaver, Chicago, IL; Susan E. Barnes, Lindquist & Vennum, Minneapolis, MN, for Marquette Bank, N.A.

Before POSNER, Chief Judge, and BAUER and WOOD, JR., Circuit Judges.

POSNER, Chief Judge.

Mark Berens was a minority shareholder in Marquette Bank Shakopee, a national bank. The bank's majority shareholder (a bank holding company) decided to consolidate the bank with several other banks that the company owned to form Marquette Bank. The terms of the consolidation required minority shareholders to surrender their shares in exchange for a cash payment based on the company's valuation of the shares. The company fixed that value at $12,071 per share (Berens owned 33 shares). Berens thought this too little and invoked his right under 12 U.S.C. § 215(d) to have the Comptroller of the Currency determine the value of his stock, see *Beerly v. Department of Treasury*, 768 F.2d 942 (7th Cir.1985) (applying § 215a, the materially identical provision for valuing stock in bank mergers); *Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1552–54 (10th Cir.1992); *Central–Penn National Bank v. Portner*, 201 F.2d 607 (3d Cir.1953) (applying a materially identical provision in a predecessor statute), which he claimed was

$16,700. The Comptroller fixed the value at $13,034 and Berens responded by filing this suit under 28 U.S.C. § 1331 against both the Comptroller and Marquette Bank. The suit claims that the Comptroller's valuation was arbitrary and so in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and that the bank should have paid Berens interest on the value of his shares from the date of the consolidation to the date on which the bank sent him a check for the amount fixed by the Comptroller. The district court rejected Berens's claims, 953 F.Supp. 249, 964 F.Supp. 1215 (N.D.Ill.1997), precipitating this appeal.

The parties agree that stock in Marquette Bank Shakopee was traded too infrequently to allow the price of those trades to be taken to be the value of the stock. They further agree that a proper substitute method of valuation is to identify banks (actually, in this case, bank holding companies, but we'll disregard that detail) whose stock is traded frequently enough to have a market value that are comparable to Marquette Bank Shakopee. The parties' chief disagreement is over how the comparative analysis should treat what Berens calls the bank's "excess capital." Between 1978 and the consolidation in 1995, the bank paid an unchanging annual dividend of $20 per share even though its earnings grew more than sevenfold during that period. By the end of the period, the bank was distributing only 1 percent of its earnings as dividends. With so little going out, the bank's capital grew substantially and by the time of the consolidation had reached $12 million. This was $5 million more than the Comptroller required it to be to support the bank's banking assets, that is, the loans and other investments of the money deposited in the bank. Berens calls this $5 million of capital "excess" and "unproductive" because, rather than being lent out at substantial interest, it was held in low-risk, low-yield securities, presumably short-term Treasury notes or the equivalent, although the record, surprisingly, is mum on the identity of the securities or the interest earned on them.

Berens's appraisers determined that banks that were comparable in size and location to the Marquette Bank Shakopee were valued

at 1.3 to 1.4 times their total capital. The appraisers multiplied the bank's $7 million of "productive" capital by these figures, and added $5 million, to determine the value of the bank on the eve of the consolidation. Their rationale for adding the $5 million rather than putting it in the base with the other capital was that investors would not value unproductive capital above its face amount.

As an alternative method of valuation, the appraisers multiplied the bank's annual earnings by 10.5, the price to earnings ratio of shares in the comparable banks, and then added the $5 million in excess capital on the theory that this entire amount could be paid out in the form of a dividend without impairing the bank's earnings. The price-earnings valuation method yielded a valuation (an "investment value," as it is called) approximately equal to the capital-valuation method.

The Comptroller, in conducting his own appraisal, made no adjustment for the presence of "excess" capital. His price-earnings valuation involved multiplying the bank's earnings by the price-earnings ratio of the comparable banks, with no addition to earnings of the $5 million. This procedure yielded a value substantially lower than that estimated by Berens's appraisers because the earnings figure that the Comptroller multiplied to derive the value of the bank was $5 million lower than Berens's earning figure. The Comptroller's capital valuation (the alternative method of valuing the firm) yielded an estimate similar to Berens's. But because the Comptroller weighted the price-earnings valuation three times as heavily as the capital valuation in determining an overall valuation, the overall valuation was more than 20 percent below that of Berens's appraisers.

His appraisers used still a third method of valuation, the discounted cash flow method, and the Comptroller didn't. But as with Berens's other methods, this one yielded a higher valuation than the Comptroller's only because Berens treated the $5 million in supposedly excess capital as in effect earnings.

 Bearing in mind that our review of the Comptroller's determination of value is deferential, *Central National Bank v. U.S.*

*Dept. of Treasury*, 912 F.2d 897, 904 (7th Cir.1990); *Beerly v. Department of Treasury, supra*, 768 F.2d at 945; *Lewis v. Clark*, 911 F.2d 1558, 1563 (11th Cir.1990) (per curiam); *Abernathy v. Clarke*, 857 F.2d 237, 239 (4th Cir.1988), we cannot say that the Comptroller acted arbitrarily either in weighting so heavily the price-earnings method of valuation or in disregarding the bank's so-called excess capital. The primary value of stock to investors is, of course, as a source of income; that is, it is an investment value. It is thus a function of the income that the stock is expected to yield (discounted to present value) and of any risks associated with the income; and that riskiness is proxied by the price-to-earnings ratio of comparable investments, in this case the stock of banks similar to Marquette Bank Shakopee. The more secure the bank's earnings prospects, other things being equal, the higher the price-earnings ratio will be.

The fact that under different management the bank might have had higher earnings, perhaps by investing its "excess" capital more "productively," is not a compelling reason for an upward valuation. That would produce the paradox that badly managed banks would be valued as highly as well managed ones. It would also discourage takeovers of badly managed banks by entitling the bank's minority shareholders to a piece of the anticipated profits under more efficient management. Frank H. Easterbrook & Daniel R. Fischel, *The Economic Structure of Corporate Law* 117–18 (1991).

Furthermore, it is far from clear that the bank *would* have had higher earnings by switching $5 million of its capital out of risk-free investments and into loans or other risky investments. We do not know what the difference in interest earnings would have been. And the fact that the bank had a large cash reserve may have emboldened it to invest its banking assets in high-risk, high-return loans that would have imperiled the bank's solvency had the bank been more thinly capitalized. In other words, the higher return on these risky investments may have offset the lower return on the safely invested "excess" capital. We were told at argument without contradiction that the

bank's total return on assets, 1.27 percent, was high; it might have been lower had thinner capitalization led the bank to adopt more conservative lending policies. Consistent with this point, when the Comptroller (in accordance with his regulations, see 12 C.F.R. pt. 3, App. A, § 3) "wrote down" the bank's banking assets to reflect their riskiness, and then compared its capital-to-asset ratio with that of the comparison banks (similarly adjusted), the bank's capital-to-asset ratio turned out to be average.

Without this adjustment the ratio would have been considerably higher than the average ratio for the comparable banks (14 percent versus 9 percent), and so, Berens now argues, they were not really comparable. But Berens's own appraisers treated the banks as comparable; they merely wanted to increase the appraised value because Marquette Bank Shakopee had decided to accumulate capital rather than pay large dividends, ignoring the reason for the bank's ratio of capital to assets *unadjusted for riskiness* being so high.

It is apparent that Berens's real gripe is not that his shares have been misvalued but that he would be better off if the bank had not followed a policy of stingy dividends. Actually, he might not be better off, as we have been stressing; but our decision does not depend on that possibility. At argument, Berens (who argued the appeal himself) acknowledged that he is trying to use the appraisal remedy to obtain the additional dividends that he thinks the bank should have paid out over the years. Maybe it should have, though, to repeat, this is uncertain and unproved. But the purpose of appraisal is to give the squeezed-out minority shareholder the value of his shares, not the value they would have had under a different corporate management.

■ The other issue for resolution is whether the bank was required to pay interest on the Comptroller-appraised value of Berens's shares from the date of the consolidation to the date on which, sixteen months later, the Comptroller having finally determined the value of the shares, the bank mailed Berens a check for that amount. The statute entitles the shareholder to the "value" of his shares; it says nothing about interest on that value, and the Comptroller's interpretation (which though informal is entitled to some weight, cf. *First Chicago NBD Corp. v. Commissioner*, 135 F.3d 457, 459 (7th Cir.1998)), and also that of the only court to have addressed the issue, is that the statute does not authorize the shareholder to receive such interest. *OCC Interpretive Letter*, 1985 WL 151205 (May 26, 1985); *OCC Trust Interpretive Letter*, 1982 WL 170877 (March 10, 1982); *Boone v. Carlsbad Bancorporation, Inc., supra*, 972 F.2d at 1552–53.

This may well be a defect in the statute; the Comptroller himself thinks so, and has urged that it be corrected by amendment. *OCC Interpretive Letter* (May 26, 1985), *supra*. It encourages a bank to offer its minority shareholders so little for their shares that they will ask the Comptroller for a valuation, as this will enable the bank to delay having to pay them; in effect it will enjoy an interest-free loan from the minority shareholders during this period. A number of parallel state statutes allow interest in such situations. See, e.g., 205 ILCS 5/29 (Illinois' bank merger law); 8 Del.Code § 262(h) (Delaware appraisal statute); *Lawson Mardon Wheaton Inc. v. Smith*, 315 N.J.Super. 32, 716 A.2d 550, 569 (N.J.App.1998); *Gilbert v. MPM Enterprises, Inc.*, 709 A.2d 663, 674 (Del.Ch.1997).

Berens cites cases that hold that prejudgment interest is presumptively available in federal suits. *In re Oil Spill by Amoco Cadiz*, 954 F.2d 1279, 1331 (7th Cir.1992) (per curiam); *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 436 (7th Cir.1989); *Barbour v. Merrill*, 48 F.3d 1270, 1278–79 (D.C.Cir.1995). But such interest is awarded only to a plaintiff who *wins* a lawsuit. Berens sued to overturn the Comptroller's valuation, and lost. So the federal common law right to prejudgment interest cannot be used in this case to plug what may indeed be a statutory loophole.

Does this mean that there is no legal remedy if, as Berens charges, the bank unconscionably delayed in paying him the value of his shares that was determined by the Comptroller? If Berens had to sue to get the money, he would have a strong claim for prejudgment interest. But he sued not for that, but for more money, and lost.

Finally, section 215 requires the bank to pay the minority shareholders "promptly" after the appraisal (not before—the omission that is the loophole that we discussed above), and this, Berens argues, was not done. But he did not ask for relief under that section until the oral argument of his appeal, and that was too late, *Kasper v. Saint Mary of Nazareth Hospital,* 135 F.3d 1170, 1174 (7th Cir.1998); the point is waived.

AFFIRMED.