[No. A085004. First Dist., Div. One. Nov. 16, 1999.]

PAUL C. P. CHENG, Plaintiff and Respondent, v.
CALIFORNIA PACIFIC BANK, Defendant and Appellant.

## COUNSEL

Arnold S. Rosenberg for Defendant and Appellant.

Lillick & Charles, James S. Monroe and Francisco J. Morales for Plaintiff and Respondent.

---

**OPINION**

**MARCHIANO, J.**—California Pacific Bank (the Bank) appeals from a summary judgment awarding prejudgment interest on the appraised value of the shares of a dissenting shareholder in a bank conversion transaction. The only issue raised on appeal is whether prejudgment interest was recoverable. We determine that the Bank was obligated to pay the appraised value of the shares on the date the value was agreed upon and that neither a dispute as to legal ownership, the provisions of federal banking laws, nor the Bank's own plan of conversion excused its duty to pay. Therefore, the shareholder is entitled to prejudgment interest from the date that he requested payment of the agreed value of the shares. The judgment awarding interest is affirmed.

### BACKGROUND

Paul C.P. Cheng's father was a shareholder of appellant Bank, which was formerly known as California National Bank. After his father died intestate, Cheng presented original stock certificates bearing his father's endorsement to the Bank. The Bank accepted the endorsed certificates, and in 1995 issued new share certificates in Cheng's name. On August 5, 1996, the Bank sent a notice to Cheng and all other shareholders announcing a meeting to ratify a proposal to convert the Bank from a national bank to a California chartered bank pursuant to the procedure in 12 United States Code Annotated section 214a. The proposed plan set out the right of shareholders who dissented from the proposal to receive the appraised cash value of their shares. Following the appropriate statutory procedure for dissenters, Cheng voted against the proposal.

On November 22, 1996, the Bank notified Cheng that the conversion of California National Bank into California Pacific Bank was completed on November 18, 1996. The letter attached a copy of the federal statute governing the conversion, and noted that it required Cheng to make a written request to receive the cash value of his shares within 30 days of the November 18 conversion date. On December 2, 1996, Cheng notified the Bank in writing that he was exercising his rights as a dissenting shareholder, returned his share certificates, and requested the value of his shares in cash under the terms of 12 United States Code Annotated section 214a(b). Pursuant to the statutory procedure for valuation of the shares of dissenting shareholders, appraisers were chosen and an appraisal was performed. The

appraisers agreed that the fair market value of Cheng's shares was $12 per share. On July 21, 1997, Cheng notified the Bank that he accepted the valuation of his shares and requested payment. The Bank did not pay.

On February 13, 1998, Cheng filed a complaint for declaratory relief requesting a determination that Cheng was entitled to immediate payment of the value of his shares, plus interest from July 21, 1997, the date of his demand. On March 27, 1998, the Bank filed a motion to strike the prayer for prejudgment interest, which was later amended to set forth the grounds that the federal statute governing bank conversions did not provide for prejudgment interest, and that the Bank had a reasonable time in which to pay Cheng. Cheng countered with a motion for summary judgment filed on July 8, 1998, stating that all requirements of the federal statute had been met, the money was due on July 21, 1997, and Cheng was entitled to prejudgment interest.[1]

The Bank responded on July 31, 1998, by filing opposition and depositing the entire appraised value of the shares with the clerk of the superior court. For the first time, the Bank claimed that there was a dispute as to Cheng's rightful ownership of the shares. The Bank attached the declaration of a questioned documents examiner, who stated that on July 17, 1998, the Bank requested him to examine the endorsement on Cheng's father's stock certificates. He concluded that the endorsements were forgeries. Based on this new claim, the Bank argued that Cheng's entitlement to the shares was disputed. The Bank's opposition claimed that it had been unable to obtain the names of Cheng's brother and other heirs to his father's estate, apparently to determine the existence of adverse claims. The Bank also argued that its plan of conversion from a national to a state bank required the shares to be sold prior to payment to Cheng. It repeated its contentions that the federal statute does not allow interest, that it had a reasonable time to pay, and that state law regarding prejudgment interest had no application.

Cheng filed opposition to the original motion to strike, urging the court to award prejudgment interest. He attached declarations from the only other heirs to his father's estate disclaiming any interest in the stock. He also attached copies of documents from the Bank's prior law firm, showing that the firm was actively involved in the transfer of shares to Cheng and his entire family. There was a series of letters regarding issuance of the shares, the appropriate arrangement for ownership of the shares, correction of errors and reissuance of the shares, and a confirmation from the Bank's own counsel that Cheng acquired the shares in a purchase transaction from his

---

[1]Cheng proposed an alternative date of December 2, 1996, the date he first elected to pursue his dissenter's rights. The court ultimately awarded interest from July 21, 1997.

father. The court denied the Bank's motion to strike on September 2, 1998, and took the motion for summary judgment under submission.

On October 19, 1998, the court entered judgment in favor of Cheng, finding there was no dispute that Cheng was entitled to the funds and awarding prejudgment interest from July 21, 1997, until the date on which the funds were deposited with the court. The Bank appeals from the judgment.

## DISCUSSION

The Bank raises two arguments on appeal contesting the award of prejudgment interest. ■ It contends that prejudgment interest is only due when the amount is vested on a particular day, and that Cheng was not entitled to the funds until he proved that the endorsement was not forged. ■ The second argument, based on federal law, is that the Bank was not obligated to pay immediately, but had a reasonable time to attempt to dispose of the shares. We discuss these claims below and conclude they have no merit.

### Cheng's Right to Payment Vested When the Sum Certain Became Due

■ Civil Code section 3287 provides in relevant part: "(a) Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of · the creditor from paying the debt."[2] The Bank argues that Cheng's share certificates carried forged endorsements, which prevented the Bank from paying him until clear title was established. The main case cited in support of this argument is *Budget Finance Plan* v. *Sav-On Food Club* (*1955*) 44 Cal.2d 565, 572, footnote 6 [283 P.2d 694]. *Budget* has no application here, as the plaintiff in that case failed to request interest and made no showing of when the obligations became due. The court noted: "Where there is no express contract covering the matter, the law awards interest on money from the time it becomes due and payable if such time is certain or can be made certain by calculation [citations, including Civ. Code, § 3287]. In the absence of a showing as to such time, and in the absence of a demand for interest, there is no occasion to award it." (*Budget Finance Plan* v. *Sav-On Food Club, supra*, 44 Cal.2d at p. 572, fn. 6.)

Aside from the undisputed fact that the Bank did not challenge Cheng's ownership or consult a questioned documents examiner until after the motion for summary judgment was filed, the existence of a dispute as to title

---

[2] The parties apparently agree that Civil Code section 3287 is the appropriate statute, if interest is to be assessed.

does not prevent the assessment of interest. In *Perkins* v. *Benguet Cons. Min. Co.* (1942) 55 Cal.App.2d 720 [132 P.2d 70], plaintiff sought to recover dividends on shares of the stock of the defendant corporation. The defendant claimed that plaintiff's husband was entitled to the dividend under Philippine law. (*Id.* at p. 724.) The court stated: "It cannot be successfully urged that the mere existence of a dispute between Mr. and Mrs. Perkins, at least in the absence of an impounding of the dividends, would relieve the defendant of liability for interest." (*Id.* at p. 766.) The *Perkins* court relied on *Conner* v. *Bank of Bakersfield* (1920) 183 Cal. 199 [190 P. 801], which involved conflicting claims to a check in an interpleader action brought by a bank. The bank claimed that it was not liable to the successful plaintiff for interest, but the Supreme Court affirmed the judgment awarding interest to the plaintiff for the period prior to the date the bank deposited the funds with the court. (*Id.* at p. 206.) The court noted that depositing the funds with the court stopped the running of interest, but that interest was due up until the bank surrendered control of the money. "When a debtor has deposited the money beyond his control in the custody of the court and within the reach of the rightful owner, he has done all that the law requires of him." (*Ibid.*) A mere dispute as to the rightful owner does not preclude the assessment of prejudgment interest.

The Bank's response to this statement of the law is that it was undisputed that Cheng was not the rightful owner of the shares, and that interest could not begin to run until the money became payable to Cheng. There is no support for this claim. The actual undisputed fact was that even if Cheng was not the rightful owner, the money never belonged to the Bank, and the Bank was not entitled to retain it during the alleged dispute.[3] The Bank's eleventh-hour question about the validity of the endorsement could not have been the reason for the earlier delay in payment and does not relieve the Bank of its obligation to pay interest. Once Cheng agreed with the appraisal of the shares and issued his demand for payment, he became entitled to payment of a specified amount, "capable of being made certain by calculation." (Civ. Code, § 3287.)

*Neither Federal Statute nor the Plan of Conversion Excused the Duty to Pay*

The Bank concedes that the federal statute governing the conversion of federal banks to state banks does not address the issue of payment of

[3]Documents submitted by Cheng showed that the Bank's outside counsel had initially issued shares to all four family members, which it failed to have countersigned. Counsel wrote several letters to the family indicating the Bank made an error in this regard. Counsel for the Bank represented to Cheng's counsel that Cheng had acquired the shares from his father in a purchase transaction. Contrary to the Bank's contention, the ownership of the shares was an issue vigorously disputed by Cheng.

interest, but argues that it allows the Bank a reasonable time in which to perform its statutory duty to pay the value of the shares of dissenting shareholders. The Bank relies on a strained reading of the statutory requirement that it prepare a plan of conversion, and on cases denying interest during the period of time that the dissenting shares are being appraised. Neither of these arguments allows the Bank to retain the money due to dissenting shareholders for over a year after the value is agreed upon, and until forced to pay by legal action.

A national bank such as the former California National Bank, may convert into a state bank by complying with the provisions of 12 United States Code Annotated section 214a. The statute was enacted in 1950 for the purpose of placing national banks on a more equal basis with state banks, which had been able to convert into federal banks since 1927. (Annot. (1973) 15 A.L.R.Fed. 817.) The legislation contained certain restrictions to prevent the undue reduction of capital funds resulting from a conversion, and sought to "protect dissenting shareholders of national banks who were opposed to a proposed conversion or consolidation by permitting them to receive the value of their stock in cash." (Sen.Rep. No. 1104, 81st Cong., 2d Sess. (1949), reprinted in 1950 U.S. Code Cong. & Admin. News, pp. 3012-3013.) The Senate Report describing the differences between section 214a and the older section 215a, which governs merger of state or national banks into national banks, noted that the new statute gave section 214a shareholders an opportunity to change their minds after voting against the conversion, by requiring an additional demand for payment within 30 days of the effective date of the consolidation. (1950 U.S. Code Cong. & Admin. News, at p. 3014.) At no point in its discussion of the differences in the two statutes did the Senate committee indicate it intended to deprive dissenting shareholders in section 214a conversions of the right to be "promptly paid" that is expressly accorded to section 215a shareholders. (12 U.S.C.A. § 215a(d).) To the contrary, the report states that the differences between the two statutes involve only "minor matters." (Sen.Rep. No. 1104, 81st Cong., 2d Sess. (1949), reprinted in 1950 U.S. Code Cong. & Admin. News, p. 3013.) Nothing in either statute indicates that a converting bank may take an undefined "reasonable time" to pay which, in this case, stretched to more than a year. We cannot conclude that the Congress intended to allow federal banks which convert to state banks to hold the funds due to dissenting shareholders for whatever time the bank deems reasonable.

The Bank refers specifically to the statutory requirement that it provide for "the manner of disposing of the shares of the resulting State bank not taken by the dissenting shareholders of the national banking association." (12 U.S.C.A. § 214a(b).) The Bank's plan provides that the shares of the

new state bank that are not taken by dissenting shareholders shall be offered for sale, first to other shareholders, then to outsiders. Inexplicably, the Bank reads this requirement as a license to eviscerate the statutory protections afforded to dissenting shareholders. According to the Bank, this requirement allows the Bank to delay payment to dissenters while it shops around for a buyer for their shares. The Bank submitted the declaration of its chief executive officer asserting that the language of the plan of conversion required "once the dissenting shareholder agreed on the value of his shares, they would be disposed of to other Bank shareholders or, failing that, to any other interested purchasers." He detailed his unsuccessful efforts to find a new buyer for Cheng's shares and stated: "It is not easy to find a purchaser for these shares." The Bank executive disingenuously noted that Cheng himself "is free to find a purchaser for his shares . . . ."

This interpretation of the requirement that the Bank provide for the manner of disposing of the shares not taken by the dissenting shareholder is unsupportable. The Bank is arguing that the shares surrendered by the shareholder must be sold, either to insiders or on the open market, before the shareholder is paid. This notion directly contradicts the rationale for the provisions protecting dissenting shareholders. "The purpose of an appraisal is to give the owner of the property being appraised the cash equivalent of what he has given up by relinquishing his ownership." (*Beerly* v. *Department of Treasury* (7th Cir. 1985) 768 F.2d 942, 946.) The *Beerly* court correctly noted that it is precisely when the market for shares is "thin" that appraisal rights are needed. "The other side of the coin is that if a stock has a 'thick' market . . . appraisal rights are unnecessary since the dissenting shareholder can fully protect his interests by selling his shares." (*Ibid.*) By refusing to pay until it sells the shares of its new bank, appellant Bank has effectively avoided complying with the statutory requirements that are intended to protect dissenters from being forced into a new company because there is no market for their shares. The Bank's interpretation of its own plan of conversion is unsupported by the language of the plan itself and the statutory protections for dissenting shareholders. Cheng was required by statute to surrender his shares when he first requested cash for his interest. (12 U.S.C.A. § 214a(b).) By surrendering his shares, he relinquishes his entitlement to dividends and other benefits of ownership while he waits for the appraisal process to conclude.[4] (*Beerly* v. *Department of Treasury, supra,* 768 F.2d 942, 946 [purpose of appraisal is to give dissenting shareholder cash

---

[4]It has been noted that the failure to provide for interest during the appraisal period rewards the offer of a low price for dissenter's shares, which leads to a lengthy delay while an appeal of the appraisal takes place. (*Berens* v. *Ludwig* (7th Cir. 1998) 160 F.3d 1144, 1147 [commenting that process in effect gives the bank an interest-free loan from the dissenting shareholders during the appraisal period].)

equivalent of the relinquished opportunity to sell the stock or keep it and obtain income from it]; *Gallois* v. *Stauffer Chemical Co.* (1963) 221 Cal.App.2d 328, 332-333 [34 Cal.Rptr. 411] [dissenting shareholder not entitled to dividends during appraisal period under state law]; see also 12B Fletcher, Cylopedia of the Law of Private Corporations (rev. ed. 1993) Stock and Stockholders, § 5906.110, p. 429 [Revised Model Business Corporation Act requires immediate payment to dissenting shareholders because rights are terminated with the completion of the merger or other transaction].) Cheng has already lost the use of his funds during the time the appraisal is proceeding. He is not required to wait for payment until the Bank finds a buyer for the interest in its new entity.[5]

The Bank has also relied on several cases involving the period in which a dissenter's shares are being appraised to argue that dissenting shareholders are never entitled to interest, even when an appraisal period takes as long as 15 months. These cases have no application here. *Beerly* v. *Department of Treasury, supra,* 768 F.2d at page 949, cited by the Bank, declined to address the issue of interest during the appraisal period because the shareholder did not raise it until he filed his reply brief on appeal. The Bank is correct that *Keeffe* v. *Citizens and Northern Bank* (3d Cir. 1986) 808 F.2d 246, 252, *Boone* v. *Carlsbad Bancorpration, Inc.* (10th Cir. 1992) 972 F.2d 1545, 1552, and *Yabsley* v. *Conover* (N.D.Ill 1986) 644 F.Supp. 689, 697, hold that dissenting shareholders are not entitled to interest during the time between surrender of the shares and completion of the appraisal process.[6] An opinion of the Comptroller of the Currency, referenced by the court of appeals in *Berens* v. *Ludwig, supra,* 160 F.3d at page 1147, recognized the distinction between the time period during the appraisal process and the time thereafter. "Although an appraisal statute may preclude a right to interest while the appraisal is still in progress, it need not necessarily preclude other rights that may arise beyond the scope of the statute. Thus, where a final appraisal has been made and the corporation, pursuant to the terms of the statute, has become obligated to pay the appraised value, a dissenter may be entitled to interest from the date the corporation's obligation became due in accordance

---

[5]This conclusion is supported by comparing it to the procedure for disposition of the shares not taken by a dissenter in the case of a state bank which converts to a federal bank. Title 12 United States Code Annotated section 215a provides that the dissenter be paid after the price is determined. The shares in the new entity are then sold at auction and the dissenting shareholder is paid any excess in the sale price over the auction price. Thus, in the comparable statute, even when the dissenters are entitled to the market value of the shares, they are not required to wait for payment until the new shares are sold.

[6]*Berens* v. *Ludwig* (N.D.Ill 1997) 964 F.Supp. 1215, 1219, affirmed in *Berens* v. *Ludwig, supra,* 160 F.3d at page 1147, which primarily concerned the period during the appraisal process, held that the plaintiff was not entitled to prejudgment interest on any amount under federal common law because he did not prevail in the lawsuit.

with applicable state law." (Office of the Comptroller of the Currency Interpretive Letter, Banking Research Dig. (May 26, 1985) 1985 WL 151205.) Contrary to the Bank's contention, federal law does not bar pre-judgment interest on the facts of this case.

Cheng, unlike plaintiffs in the cases relied upon by the Bank, has not claimed a federal right to interest for the loss of his shares during the inherent delay in the appraisal process. Cheng claims a state right to interest after the completion of the appraisal established a sum certain due at that time. Cheng was forced to bring an action in state court, against a state-chartered bank, in order to obtain payment for his shares.[7] He prevailed in his action. Even national banks "have traditionally been 'governed in their daily course of business far more by the laws of the State than of the Nation. All their contracts are governed and construed by State laws.' " (*Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 937 [216 Cal.Rptr. 345, 702 P.2d 503].) Regarding national banks, the Supreme Court stated: "[A] national bank is subject to state law unless that law interferes with the purposes of its creation, or destroys its efficiency, or is in conflict with some paramount federal law." (*Lewis* v. *Fidelity Co.* (1934) 292 U.S. 559, 566 [54 S.Ct. 848, 851, 78 L.Ed. 1425, 92 A.L.R. 794].) Enforcement of Cheng's claim for prejudgment interest does not impair, diminish, or interfere with federal banking law policies. Although federal law imposes no barrier to prejudgment interest, we need not look to federal law regarding bank conversions to determine the rights and liabilities of a state bank and a resident of the same state. Matters of assessing prejudgment interest under the facts of this case involve issues that are outside the scope of the federal law.

California law provides for prejudgment interest for "[e]very person who is entitled to recover damages certain, or capable of being made certain by calculation . . . ." (Civ. Code, § 3287.) Cheng is such a person. The amount to be recovered became certain when Cheng accepted the appraisal and the Bank became obligated to pay at that time. The trial court correctly awarded prejudgment interest in this case.

---

[7] It is undisputed that the plan of conversion was completed on November 18, 1996, and California Pacific Bank became a state-chartered institution on that date. Section 4950 of the Financial Code, pertaining to the conversion of federal banks to state banks, provides that when the conversion is effective, "[t]he converting depository corporation shall cease to exist." (See also Fin. Code, § 4820.5, subd. (a), providing that a "depository corporation" is a bank.) The only possible defendant in Cheng's action was the resulting state bank.

## Disposition

The judgment is affirmed.

Stein, Acting P. J., and Swager, J., concurred.